STATE OF MINNESOTA *vs*. EMMA LEE.

October 21, 1882.

House of Ill-Fame—Conviction under City Ordinance—Prosecution by State.—A prosecution and conviction, under an ordinance of the city of St. Paul, for keeping a house of ill-fame in said city, constitute no bar to a prosecution for the same act by indictment, under Gen. St. 1878, c. 100, § 9.

The defendant, being arraigned in the district court for Ramsey county, on an indictment for keeping a house of ill-fame, resorted to for purposes of prostitution, in the city of St. Paul, on May 1, 1881, and at divers other dates and times between that day and the day of the date of the indictment, (October 11, 1881,) pleaded (1) not guilty; (2) two special pleas.

In the first of the special pleas it is alleged that under the charter of the city of St. Paul (Sp. Laws 1868, c. 26,) the common council did, on October 7, 1869, "duly adopt and publish an ordinance to suppress houses of ill-fame in said city, and to provide for the arrest and punishment of the keepers thereof, and did, in and by said ordinance, provide for the arrest and trial before, and conviction and sentence by, the city justice of the said city of St. Paul; and which said ordinance provides for and regulates the proceedings for the arrest, trial, conviction and punishment of all persons who shall keep houses of ill-fame or places resorted to for the purpose of prostitution within the limits of said city, thereby providing for the punishment of the specific offences and specific acts charged in the indictment in this case." This special plea then states an amendment to the city charter in 1875, whereby there was established in the city a court of rec-

ord, styled the Municipal Court, "to which said court therein was granted all the powers and authority theretofore given in said city to the city justice."

The defendant's second special plea was "that she has already been duly convicted and punished under the charter and ordinances of the said city of St. Paul of and for the said offence of keeping a house of ill-fame, resorted to for the purpose of prostitution, committed at said city of St. Paul, and in said county of Ramsey, on the 1st day of May, A. D. 1881, and on divers other days and times between that day and the day of the date of this indictment, and has paid the penalty and suffered the punishment therefor, in accordance with the provisions of the charter and ordinances of said city referred to in her second plea, which said convictions are for the same offence and same specific acts of offence, as regards all matters and things in the said indictment charged; which said convictions and punishments were had by the judgments of the municipal court of the said city of St. Paul, rendered at the said city the days following, to-wit: May 2, A. D. 1881; June 1, A. D. 1881; July 1, A. D. 1881; August 1, A. D. 1881; September 1, A. D. 1881, and October 1, A. D. 1881. The defendant therefore pleads that she has been duly convicted and punished for the same offence charged in this indictment against her."

At the trial before *Brill*, J., the evidence offered by defendant in support of her special pleas was objected to and excluded, to which she duly excepted. The jury returned a verdict of guilty, a motion for a new trial was denied after argument before *Wilkin, Brill,* and *Simons,* JJ., and the defendant appealed.

The charter provisions referred to are as follows: (Sp. Laws 1868, c. 26, as amended by Sp. Laws 1874, c. 1.)

"The common council shall have * * * full power and authority to make, enact, ordain, establish, publish, enforce, alter, modify and repeal all such ordinances, rules and by-laws for the government and good order of the city, for the suppression of vice and intemperance, and for the prevention of crime, as they shall deem expedient. * * * The common council shall have full power and authority to declare and impose penalties and punishments and to enforce the same against any person or persons who may violate any

of the provisions of any ordinance, rule or by-law passed or ordained by them; and all such ordinances, rules and by-laws are hereby declared to be and have the force of law: *provided*, that they be not repugnant to the constitution and laws of the United States or of this state; and, for those purposes, shall have authority, by ordinances, resolutions, or by-laws. * * * *Third*—To prevent any riots, noise, disturbance and disorderly assemblages in said city, and to provide for the arrest and punishment of any person or persons who shall be guilty of the same; to suppress disorderly houses or groceries and houses of ill-fame, and to provide for the arrest and punishment of the keepers thereof." Sp. Laws 1868, pp. 69, 70; Sp. Laws 1874, pp. 30, 31.

"*Thirty-fifth*—Fines, penalties and punishments, imposed by the common council for the breach of any ordinance, by-law, or regulation of said city, may extend to a fine not exceeding one hundred dollars, and imprisonment in the city prison and county jail not exceeding thirty days, or both, and to be fed on bread and water, at the discretion of the city justice." Sp. Laws 1868, p. 75; Sp. Laws 1874, p. 35.

"*Thirty-sixth*—The common council of said city may provide by ordinance that any one convicted of an offence before the city justice, subjecting such offender to imprisonment under the charter and ordinance of said city, may be kept at hard labor in any work house established by said city for that purpose," etc. Sp. Laws 1868, p. 75; Sp. Laws 1874, p. 35.

"The city justice for the city shall possess all the authority, power and rights of a justice of the peace of the county of Ramsey under the laws or constitution of the state, and shall have, in addition thereto, sole exclusive jurisdiction to hear all complaints and conduct all examinations and trials in criminal cases within the city cognizable before a justice of the peace. * * * The said justice shall have exclusive jurisdiction in all cases cognizable before a justice of the peace in which the city is a party, and shall have cognizance and exclusive jurisdiction of all suits, prosecutions or proceedings for the recovery of any fine, forfeiture or penalty under any by-law, ordinance or regulation of said city of Saint Paul or its charter, or for

the breach or violation of any such by-law, ordinance or regulation, and in all cases of offences committed against the same. All prosecutions for assaults, batteries, affrays, and other offences not indictable, and for a breach or violation of any such by-law, ordinance or regulation, shall be commenced in the name of the city of Saint Paul, and the same proceedings shall be had in all civil and criminal suits before said justice, where not otherwise herein directed, as are established and required to be had in civil and criminal actions by the laws of this state before a justice of the peace. * * * In all cases of convictions for assaults, batteries, affrays, and other offences not indictable, within said city, and in all cases of conviction under any ordinance of said city for breach of the peace, disorderly conduct, keeping houses of ill-fame, or of frequenting the same, and of keeping or maintaining disorderly and ill-governed houses, the justice shall have power, in addition to the penalty imposed, to compel such offenders to give security for their good behavior and to keep the peace, for a period not exceeding six months, and in a sum not exceeding five hundred dollars." Sp. Laws 1868, pp. 63–4, § 11; Sp. Laws 1874, p. 27, § 16.

The act establishing a municipal court in St. Paul amends Sp. Laws 1874, c. 1, by substituting the words "judge of the municipal court," in place of the words "justice of the peace for the city" and "city justice," wherever they occur in that act. Sp. Laws 1875, c. 2, § 1.

The ordinance pleaded and offered in evidence is, so far as here material, as follows:

"ORDINANCE No. 10.

"Disorderly Houses and Houses of Ill-fame.

"The common council of the city of St. Paul do ordain as follows:

"Section 1. Any person or persons who shall, within the limits of the city of St. Paul, keep a house of ill-fame or a place resorted to for the purpose of prostitution or lewdness, or who shall keep a disorderly or ill-governed house or place, * * * and all persons, male or female, who resort to such disorderly houses or houses of ill-fame,

every person shall, on conviction thereof before the city justice, be
punished by a fine not less than five nor more than one hundred dol-
lars, and imprisonment not exceeding thirty days, or either, at the
discretion of the said justice, and may moreover be held to bail for
good behavior: *provided,* proof of general reputation of ill-fame and
disorderly conduct shall be sufficient evidence that such house is a
house of ill-fame, or a place of disorderly conduct, within the mean-
ing of this ordinance."

*Edmund R. Hollinshead,* for appellant.

*William J. Hahn,* Attorney General, for the State, cited *Mayor* v.
*Allaire,* 14 Ala. 400; *Vason* v. *City of Augusta,* 38 Ga. 542; *Rech* v.
*State,* 53 Ga. 73; *Severin* v. *People,* 37 Ill. 414; *Phillips* v. *People,*
55 Ill. 429; *Ambrose* v. *State,* 6 Ind. 351; *State* v. *Moore,* 6 Ind. 436;
*State* v. *Foster,* 33 Iowa, 525; *State* v. *Inness,* 53 Me. 536; *Shafer* v.
*Mumma,* 17 Md. 331; *Com.* v. *Roby,* 12 Pick. 496; *People* v. *Jackson,*
8 Mich. 110; *State* v. *Oleson,* 26 Minn. 507; *State* v. *Crummey,* 17
Minn. 72; *City of St. Louis* v. *Cafferata,* 24 Mo. 94; *State* v. *Harper,*
58 Mo. 530; *State* v. *Gordon,* 60 Mo. 383; *State* v. *Wister,* 62 Mo.
592; *City of Brownville* v. *Cook,* 4 Neb. 101; *Burns* v. *People,* 1
Parker, Cr. Cas. 182; *People* v. *Saunders,* 4 Parker, Cr. Cas. 196;
*People* v. *Cramer,* 5 Parker, Cr. Cas. 171; *State* v. *Bergman,* 6 Ore-
gon, 341; *Hamilton* v. *State,* 3 Tex. App. 643; *Lowe* v. *State,* 4 Tex.
App. 34; Bishop on Stat. Crimes, § 23; 1 Bishop on Crim. Law, §
1068; Cooley on Const. Lim. 198; Dillon on Mun. Corp. § 500.

VANDERBURGH, J. The defendant was indicted and tried in the
district court of Ramsey county, at the October term, 1881, for the
offence of keeping a house of ill-fame, resorted to for the purpose of
prostitution. Upon the trial the defendant offered to prove, under a
plea of former conviction, that she had been duly convicted of the
same offence under an ordinance of the city of St. Paul. The princi-
pal question to be considered here is whether the court erred in reject-
ing this evidence. The same question was considered in *State* v. *Ole-
son,* 26 Minn. 507, and it was held by a majority of the court, as then
constituted, that such former conviction was no bar to the state prose-
cution, though the justices rested their conclusions upon different

grounds. The decision was nevertheless an authority which properly governed the district court in its decision. But the division in opinion in that case requires a reconsideration of the question in this.

It is the judgment of a majority of the court that the law of the state, which punishes this offence as a felony, has not been superseded by the charter and ordinance of the city, but that the jurisdiction of the state to try the offence remains wholly unaffected and unimpaired; that the state has not surrendered or delegated to the municipality the power to punish it as a crime against the commonwealth; that the general law and the local ordinance must stand together; and also that a conviction under the latter must be adjudged to be no bar to a prosecution under the former. Though this last proposition was not directly decided in *State* v. *Charles*, 16 Minn. 474, and *State* v. *Ludwig*, 21 Minn. 202, yet we think the opinion in each case contains a clear intimation in support of the doctrine.

Municipal corporations are chartered and vested with the powers of a local government, in addition to the powers exercised by the state under the general laws, because the concentration of population and business in a particular locality requires special police regulations, with the power in the local jurisdiction to enforce them in a summary way. *Waldo* v. *Wallace*, 12 Ind. 569, 584. Hence these powers, in so far as they relate to the public order and morals, must be regarded as purely municipal in their character, to be exercised through such police regulations, and in no sense a substitute for the administration of the general criminal laws of the state through its own tribunals, except where the legislature plainly so provide. Says Mr. Cooley: "An act may be a penal offense under the laws of the state, and further penalties under proper legislative authority be imposed for its commission by municipal by-laws, and the enforcement of the one would not preclude the enforcement of the other." Cooley on Const. Lim. (4th Ed.) 242.

It is usual to give the local courts in such cases jurisdiction, also, over inferior offences under the general laws. And as to such offences their proceedings and judgments are on the same footing with those of other state courts of similar jurisdiction. In some instances, also, from the nature of the case and the terms of the charter, it may be

reasonably implied, particularly as to minor offenses, properly of police or municipal cognizance, (as frequently in the case of liquor licenses,) that the enforcement of the municipal by-law is intended to supersede and bar prosecutions by the state. How far the legislature might authorize the corporation to prohibit and punish, under its own by-laws, criminal offences under the general laws, or how far such by-laws might be substituted by charter provisions for such general laws, is not necessary to be discussed in this case, because nothing of the kind is attempted in the charter under consideration. Such legislation, if indeed permissible, is not usual, however, as to the higher grades of offences. *Howe* v. *Treasurer of Plainfield,* 37 N. J. Law, 145; *Com.* v. *Turner,* 1 Cush. 493.

1. An offence against a municipal by-law, proceeding from the same act which also constitutes a felony under the general law, is not for that reason to be considered the same offence, because the two are distinct in their legal character, both as to the nature and quality of the offences and the jurisdictions offended against; and a former conviction, to be a bar, "must be upon a prosecution for the same identical act and crime." 4 Bl. Com. 336; *Wragg* v. *Penn Township,* 94 Ill. 11; *Freeland* v. *People,* 16 Ill. 380; *Severn* v. *People,* 37 Ill. 414. The terms "by-law," "ordinance" and "municipal regulation" have substantially the same meaning, and are defined "to be the laws of the corporate district, made by the authorized body, in distinction from the general law of the state." They are local regulations for the government of the inhabitants of the particular place. 1 Dillon on Mun. Corp. (2 Ed.) §§ 244, 300. The authority to make "by-laws" is a widely different thing from the general power to make "laws." *Com.* v. *Turner, supra.* Such by-laws, though given the force of law by the charter for the purposes of the municipal government, yet relate to that solely, and prosecutions for their violation have no reference, as a general rule, to the administration of criminal justice by the state. *Mayor* v. *Rouse,* 8 Ala. 515. The term "police," as used to define the character of such regulations and prosecutions, is used in its limited sense and more common acceptation, as relating to public order, health, etc. The term "crime" or "public offence," as used in the general laws, is not understood as referring to the so-called

offences against a municipal government. Gen. St. 1878, c. 91, §1
et seq.; City of Kansas v. Clark, 68 Mo. 588. By the constitution of
the state of Iowa it is provided that all "prosecutions shall be con-
ducted in the name and by the authority of the state." It was held
that this applied only to prosecutions for violations of the criminal
laws of the state, and that it was not intended that the state should
be a party to petty prosecutions under the police regulations of a mu-
nicipal corporation. City of Davenport v. Bird, 34 Iowa, 524; City
of Emporia v. Volmer, 12 Kan. 622. And where by the terms of a
city ordinance it is provided that its violation shall be punished by
the infliction of a pecuniary penalty enforced by imprisonment, the
procedure in the name of the city, though commenced by warrant and
criminal in form, is usually held quasi criminal rather than criminal
in character, on the ground that it is not properly a crime against
public law. Ex parte Hollwedell, 74 Mo. 395; City of Kansas v.
Clarke, supra; President, etc., v. McKernan, 54 Wis. 487; Will-
iams v. City Council, 4 Ga. 509; Williamson v. Com., 4 B. Mon. 146;
City of Goshen v. Croxton, 34 Ind. 239. The doctrine is also main-
tained that trial by jury may be withheld in cases of summary trials
in police courts. Byers v. Com., 42 Pa. St. 89; Howe v. Treasurer
of Plainfield, supra; Dillon on Mun. Corp. (2d Ed.) § 361, note.

These several classes of cases are instructive as serving to illustrate
the nature of the municipal jurisdiction, and the legitimate purpose
of prosecutions under municipal ordinances. Offences against them
require summary treatment, and no great stress is laid upon the form
of the procedure. Severe penalties would, from the nature of the
case, seem to be inappropriate to such summary trials. Nor are they
followed by the odious consequences which usually attach to convic-
tions upon the more solemn trials for offences under the general laws.
The city ordinance does not have respect to the guilt or moral turpi-
tude of the act constituting the offence considered as a crime, but
only to the purposes of a police regulation. Shafer v. Mumma, 17
Md. 331. In England and many of the older states, where the pro-
cedure usually takes the form of penal actions for the recovery of
fines, the question in dispute here could not arise. The confusion and
difficulty have arisen out of the form and nomenclature given to the

proceedings under such by-laws. And yet they remain the same in substance, and the distinction is more nominal than real. The same municipal needs require the same police remedies. They are styled criminal even where in fact only *quasi* criminal, and offences designated in the charter as "offences against by-laws" come to be classed in common usage with crimes and public offences under the constitution and laws of the state. *Wiggins v. City of Chicago,* 68 Ill. 372.

One who has been imprisoned in pursuance of a judgment in bastardy proceedings, criminal in form, though not in fact, (*State v. Becht,* 23 Minn. 1,) and who has also been punished for the same act under the criminal laws of the state; or one who has been mulcted in damages to the injured party, and has also suffered the penalty of a breach of the peace, may be said in common parlance to have been punished twice. So, in one way or another, in order to render them effctual, the infliction of penalties is resorted to to enforce municipal regulations, and offenders against them are punished, not for a public offence, of which the municipal authorities cannot take jurisdiction, and with which they have no concern, but for an offence against a by-law cognizable by them alone. One who is within the limits of the municipal jurisdiction must not only obey the laws of the state, but also adjust his conduct to the requirements of the local by-laws. And an act which, outside a city, would subject him to punishment by the state only, committed inside its limits, by reason of the place and the consequent aggravation attending it, will render him liable also to the additional penalty. The same act, prohibited by both the city and the state, may thus constitute two offences, which are intrinsically and legally distinguishable. In support of this proposition the authorities are abundant and nearly unanimous. *Waldo v. Wallace,* 12 Ind. 569; *Wragg v. Penn Township,* 94 Ill. 11; *Robbins v. People,* 95 Ill. 175; *Greenwood v. State,* 6 Baxter, (Tenn.) 567; *State v. Williams,* 11 S. C. 288; *Howe v. Treasurer of Plainfield,* 37 N. J. Law, 145; *Mayor v. Allaire,* 14 Ala. 400; *Hamilton v. State,* 3 Tex. App. 643; *Shafer v. Mumma,* 17 Md. 331; *State v. Sly,* 4 Oregon, 277; *State v. Bergman,* 6 Oregon, 341; *City of Brownville v. Cook,* 4 Neb. 101; *McLaughlin v. Stephens,* 2 Cranch, C.

C. 148, approved in *Polinsky* v. *People*, 11 Hun, 390. The text-writers, Cooley, Dillon, and Bishop concur in the same conclusion. We think the authorities on the subject altogether too respectable and weighty to be disregarded.

The analogy frequently suggested in the case of an offence against a state and the United States, growing out of the same act, though not complete, yet serves as an illustration of a distinction constantly recognized between offences against municipal and general laws. The learned author of the work on statutory crimes states the result of the authorities and the better doctrine to be "that just as the same act may be an offence against both the United States and a state, and punished by both, so also it may be against a municipal corporation and a state." Bishop on Stat. Crimes, (2d Ed.) § 24. The constitution assumes and recognizes the existence and necessity of municipal corporations as bodies politic, having such powers of local self-government under grants from the legislature as are ordinarily conferred on them, and such as they have usually possessed and exercised in the past, both in England and this country. *City of St. Paul* v. *Colter*, 12 Minn. 41; *People* v. *Hurlbert*, 24 Mich. 44, 96; *Greenwood* v. *State*, 6 Baxter, (Tenn.) 567. Though its authority is derivative and local, the municipal corporation may be considered a separate government under its charter, which, subject to the general laws, stands for its constitution. The operation of the general laws remaining unimpaired, the local laws of the muncipality are extra, and relate to matters which are properly of municipal cognizance. The local government simply enforces its own laws, for a purpose separate and distinct from that of the general laws, having special reference to the suppression and restraint of the elements of disorder and immorality. *State* v. *Charles*, 16 Minn. 474. In view of the history, nature and purposes of such corporations, it seems to be clear that the legislature has the power to grant such chartered privileges to them as bodies politic, without surrendering any of the jurisdiction of the state over offences against it. *State* v. *Oleson*, 26 Minn. 507. It is essential to good government and the public welfare that the authority of the state and municipality should thus stand together. And we do not think the constitutional powers of the gov-

ernment are so circumscribed as not to permit this, or that the common-law principal as to second jeopardy, incorporated in our constitution, was ever intended to apply in such cases. *Greenwood* v. *State*, 6 Baxter, (Tenn.) 567, 574.

2. The charter of the city of St. Paul confers no authority on the city council to enact by-laws for the punishment of offences under the general laws of the state, but for municipal purposes only. The jurisdiction originally given to the city justice has been conferred on the municipal court, and, as will appear by section 16 of chapter 3 of the charter, (Sp. Laws 1874, p. 27,) he was given "cognizance and exclusive jurisdiction of all suits, prosecutions, or proceedings for the recovery of any fine, forfeiture, or penalty under any by-law, ordinance, or regulation, * * * and in all cases of offences committed *against the same.*" All such prosecutions were also directed to be conducted in the name of the city. These provisions were in existence when the decision in the case of *State* v. *Charles* was made, in which it was expressly decided that the jurisdiction of the state over the offence in this case was not excluded or superseded by the above or other provisions of the charter. The city court is given exclusive jurisdiction of offences against by-laws. This leaves the jurisdiction of the state courts unimpaired as to offences against the laws. The offence triable in each court is necessarily distinct. The charter excludes the idea of concurrent jurisdiction of one and the same offence. If it were in fact the same offence, then there would be no escape from the conclusion arrived at by Justice Berry in *State* v. *Oleson*, that the ordinance was void, because an offence like the one in question, indictable at common law and under the statute, could not be tried under the procedure provided for in the police court.

It is clear enough, however, that the legislature, adopting the common understanding and prevalent construction, intended to distinguish the two classes of offences. And, as we have seen, offences, to be the same, must be identical in law as well as in fact. In the grant of powers to the city council (Sp. Laws 1874, *c.* 1, *subc.* 4, § 3,) they are authorized to make and enforce by-laws for "the government and good order of the city, for the suppression of vice and intemper-

ance, and the prevention of crime, as they shall deem expedient." And they are further empowered to declare and impose penalties and punishments for the violation of any ordinance made by them. "*And for these purposes* they shall have authority— * * * *Third.* To prevent any riots, noise, disturbance and disorderly assemblages in said city, and to provide for the arrest and punishment of any person or persons who shall be guilty of the same; to suppress disorderly houses or groceries, and houses of ill-fame, and to provide for the arrest and punishment of the keepers thereof. * * * *Thirty-fifth.* Fines, penalties and punishments, imposed by the common council for the breach of any ordinance, by-law, or regulation of said city, may extend to a fine not exceeding one hundred dollars, and imprisonment in the city prison or county jail not exceeding thirty days." Offenders also may be required to give security for their good behavior. The ordinance (Ordinance No. 10, as amended February 20, 1873) in question is enacted strictly in pursuance of these provisions. It is directed against the keepers of disorderly places, including houses of ill-fame, as well as "all persons, male or female, who resort to such disorderly houses or house of ill-fame;" and "every person shall, on conviction thereof before the city justice, be punished by a fine not less than five nor more than one hundred dollars, and imprisonment not exceeding thirty days, or either, at the discretion of the said justice, and may moreover be held to bail for good behavior; *provided,* proof of general reputation of ill-fame and disorderly conduct shall be sufficient evidence that such house is a house of ill-fame or place of disorderly conduct, within the meaning of this ordinance." It is also made the duty of the police to report all infractions of the ordinance.

We have been particular to set forth the material portions of the charter and ordinance, in order that it might appear how carefully and judiciously they were framed to avoid any interference with the jurisdiction of the state over crime. Nothing could be clearer than that the limited punishment provided has reference solely to the enforcement of the authority given by the charter to the council to make "rules and by-laws for the good order of the city and the

suppression of vice and intemperance," in section 3 of chapter 4, above quoted, (and to which its authority is limited,) as police regulations required for the exigencies and purposes of the municipal government. The classification in the ordinance of the keepers of houses of ill-fame with those of other disorderly houses, and with those who resort thereto, all alike subject to the same penalties; the procedure, including the provision for security for future good behavior; the summary nature of the trial and conviction,—clearly mark and distinguish the offence against the ordinance from the public offence against the general law. A similar characteristic may also be noted, in that this ordinance is satisfied with a less degree or quantity of evidence than is required on the trial of the offence under the general law, (which must be beyond reasonable doubt.) Under it "proof of general reputation of ill-fame and disorderly conduct" shall be not merely competent but "sufficient evidence that such house is a house of ill-fame or place of disorderly conduct, within the meaning of this ordinance."

Acts of violence constituting felonies under the general law, but classed as disorderly conduct under a city ordinance, it is well settled may be punished under the ordinance, without affecting the subsequent public prosecution. See cases reviewed in *Wragg* v. *Penn Township*, 94 Ill. 11; *President, etc.,* v. *McKernan,* 54 Wis. 487. Among other cases it was so held also as to keepers of gaming houses, in *Robbins* v. *People* and *Greenwood* v. *State, supra,* and there is no good reason why the rule should not apply in like manner to keepers of other places of vile resort. We observe in passing that the provisions of the general law for the organization of cities in reference to ordinances and punishment are substantially a transcript from the charter under review. Gen. St. 1878, *c.* 10, tit. 4. We presume the same is true as to many of the special city charters in the state. Also in the general law for the organization of villages (Gen. St. 1878, *c.* 10, § 207, subd. 13,) we find the power given to enact ordinances "to restrain and punish vagrants, mendicants, street beggars and prostitutes, and to suppress houses of ill-fame;" the offences to be prosecuted in the corporate name before the village justice, who is given exclusive and original jurisdiction.

This will serve to illustrate the popular and legislative construction of the character of municipal by-laws and offences.

The plea in this case shows that the defendant had been previously convicted regularly once a month under the city ordinance in question, from the time laid in the indictment, in May, to October, inclusive. Now, since the municipal court is open every week-day, and it is presumed that the officers in the discharge of their duty will be vigilant in detecting and promptly reporting and arresting offenders, it is likely that in this class of cases the summary conviction before the magistrate will ordinarily anticipate the action of the grand jury; so that, if the state is barred by the local prosecution, it would work a practical repeal of the statute in its operation in all the localities where the offence most prevails, taking into account the cities and villages organized under the general laws as well as under special charters. "The result of which is," as Mr. Bishop remarks, "that the by-law would repeal the general law for the cases in which the prosecution is first had under it." As also said in *Robbins* v. *People*, 95 Ill. 175, 177, "the effect would be a material abridgment of the punishment which the statute imposes," and "we cannot allow that a city has power, through an ordinance, to repeal or essentially modify the statute." While we do not base our opinion upon the necessities of the case, yet these considerations are entitled to their proper weight in the discussion, and strengthen the argument in support of the conclusion we have arrived at in this case as to the nature and effect of prosecutions under city by-laws. And we think such has been the construction of the courts of nearly all the states where the question has arisen, extending back for fifty years, and the common understanding on the subject with which charters have been granted, and the sense in which they have been accepted and acted on by the people, and that such practical construction of the law is entitled to great weight. *Village of Platteville* v. *Bell*, 43 Wis. 488, 493; *City of Faribault* v. *Misener*, 20 Minn. 396.

All the other questions raised in this case were fully considered and determined in the case of *State* v. *Smith, ante*, p. 193, submitted at the same term.

The order should be affirmed.

BERRY, J.   Upon further examination and reflection, I think that the view taken by myself in *State* v. *Oleson*, 26 Minn. 507, as to the nature and effect of a conviction under the city ordinance involved in that case, as also in the case at bar, was erroneous.   My opinion now is that the view taken by Mr. Justice Cornell in *State* v. *Oleson*, and by my brother Vanderburgh in the case at bar, is the true one, and I agree in general and substantially to the reasons advanced in its support.   I may briefly outline the reasoning which is most influential in leading me to my present opinion, as follows:

Our constitution vests the law-making power in the legislature. This includes authority to pass laws creating municipal corporations,— an authority which is also expressly recognized in section 2, article 10.   It is an authority to create them with all customary powers, one of which is the power to adopt by-laws or ordinances to suppress houses of ill-fame, resorted to for purposes of prostitution, to punish the keepers thereof, to affix penalties to the violation of such ordinances, and to enforce the same by judicial proceedings in some court of the municipality.   Our constitution also declares that "no person for the same offence shall be put twice in jeopardy of punishment." Is the violation of a city ordinance, passed (as is that involved in this case) under the customary powers of a municipal corporation, an *offence* within the meaning of this constitutional declaration?   This seems to me to be largely, if not altogether, a question of definition— a question of what is meant by the word "offence," (in the connection in which it is used in the constitution,) according to its general acceptation.   As thus defined by common usage, I do not think the word "offence" includes violations of city ordinances adopted under the customary powers mentioned.   There is probably no state in the Union, the constitution of which does not contain a declaration substantially like that above quoted from our own, and I think there is not at this time one which distinctly holds that the word offence, as employed in these declarations, includes these violations of city ordinances, while many of them, if not all, in which the question has been determined, hold the contrary.   This is in accordance with what has always been the general and almost unanimous understanding in this

country.  A like view prevails in the courts of England in reference to a principle of the unwritten constitution of that country, analogous to our constitutional declaration.  I think this general usage ought (according to a familiar rule) to determine the meaning of the word offence in the declaration which I have quoted from our constitution. I cite no authorities—they will be found in abundance in any leading work on crimes.

MITCHELL, J.  I fully concur in the conclusions arrived at, in this case, by my brother Vanderburgh, and substantially with all the reasons and arguments advanced by him in their support.  I do not think that a prosecution for a violation of an ordinance of a municipal corporation is a prosecution for a crime or offence, within the meaning of the constitutional prohibition against putting a party twice in jeopardy of punishment for the same offence, although the act constituting the violation of the ordinance may be a crime under the statutes of the state.    In England almost from time immemorial, and in this country from its earliest history, municipal corporations have been granted the power to forbid certain acts of this character by ordinance or by-law, and to impose a penalty for its violation.    The guaranty against being put twice in jeopardy for the same offence has been an universal principle of the common law of England for centuries.    Yet never in England, that I am aware of, and rarely in this country, has the validity of such ordinances been questioned, or the doctrine advanced that a prosecution for a violation of such an ordinance was a bar to an indictment for the same act as an offence against the state.    So general and long-continued has a contrary view been entertained and acted upon by both the legislative and judicial branches of government, that, as suggested by my brother Berry, it has become a definition of the term "offence," as used in the constitution, and has established a construction of the constitutional guaranty referred to so firmly that it ought not now to be seriously questioned.    As suggested by my brother Vanderburgh, in England, and some of the older states of the Union, municipal by-laws were usually enforced by a civil action to recover a penalty for their violation.

Had we retained this method, it would hardly have been urged that a recovery in such an action would be a bar to an indictment for crimes arising out of the same act or fact. The confusion has arisen from the fact that, in framing municipal charters and ordinances, and in providing machinery for their enforcement, we have adopted largely the nomenclature and machinery of the criminal procedure. But it is the substance and not the name which determines the nature of things.

There are other considerations, founded on public policy and public necessity, which, although not controlling, are entitled to weight. The principle involved is far-reaching. There are many things, besides keeping houses of ill-fame, which municipal corporations are authorized to suppress by ordinance, which are crimes under the general laws of the state. Now, if, on the one hand, it be held that all such ordinances are void as repugnant to the general statutes, and that a municipal corporation cannot prohibit by ordinance any act which is a crime under such statutes, the corporations would be shorn of many police powers which they have always been supposed to possess, and which are absolutely necessary to the preservation of good order within their limits. On the other hand, if it be held that a so-called prosecution under a city or village ordinance is a bar to a prosecution for the same act as a crime under the general criminal laws of the state, it would virtually amount to a repeal *pro tanto* of these general laws in every city, town, and village in the state. Such a sweeping abdication on the part of the state of her authority to punish crime, in favor of the uncertain and variable ordinances of every city and village, would be too alarming in its consequences to be seriously entertained. It would result in the anomaly of the same crime being liable to be punished in as many various ways as there are cities and villages in the state, and of the same crimes, when committed within the limits of a city or village, being punishable only by a petty fine, which, if committed in the rural districts of the state, would be punishable by imprisonment in the state prison.

But these and other weightier reasons have been so ably and exhaustively advanced by my brother Vanderburgh that nothing was necessary to be added except to express my concurrence.

GILFILLAN, C. J., *dissenting.*   I dissent upon the grounds stated by me in the case of *State* v. *Oleson,* 26 Minn. 507.

DICKINSON, J., *dissenting.*   I dissent from the opinion of the court. I think the ordinance is valid, having the force of, and being in reality, a law of the state, enacted pursuant to authority conferred by the legislature.   Both in the creating of the ordinance, and in the prosecution for its violation, the sovereign power of the state was exercised, and the prosecution and conviction constituted a defence to a subsequent indictment for the same act.   It is not important that the legislature did not intend that such should be the result of an enforcement of the ordinance.   The law having been created, and executed in the conviction and punishment of the offender, the constitution forbids a second prosecution.   "No person, for the same offence, shall be put twice in jeopardy of punishment."

NOTE.   *State* v. *Nellie Otis* was argued and submitted by the same counsel, and at the same time with the foregoing case, and was disposed of in the same way, and the order denying a new trial was affirmed.